**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|                                        |     |                                     |
| -------------------------------------- | --- | ----------------------------------- |
|                                        | )   |                                     |
| **CRAIG A. ROBISON,**                  | )   |                                     |
|                                        | )   |                                     |
| **Plaintiff,**                         | )   |                                     |
|                                        | )   | **No. 10 C 2304**                   |
| **v.**                                 | )   |                                     |
|                                        | )   | **Magistrate Judge Jeffrey Cole**   |
| **MICHAEL J. ASTRUE,**                 | )   |                                     |
| **Commissioner of Social Security,**   | )   |                                     |
|                                        | )   |                                     |
| **Defendant**                          | )   |                                     |
|                                        | )   |                                     |

## MEMORANDUM OPINION AND ORDER

Craig Robison seeks review of the final decision of the Commissioner ("Commissioner"),
of the Social Security Administration ("Agency") denying his application for Disability Insurance
Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 423(d)(2). Mr.
Robison asks the Court to reverse the Commissioner's decision and remand for an award of benefits,
or in the alternative, reverse and remand for further proceedings. The Commissioner seeks an order
affirming it.

### I.
### THE PROCEDURAL HISTORY OF THE CASE

Mr. Robison applied for Disability Insurance Benefits on December 1, 2005. (Administrative
Record ("R.") 22). His claim was initially denied on May 31, 2006, and again upon reconsideration
on August 17, 2006. (R. 22). He appeared and testified at a hearing held on November 14, 2007
before Richard Boyle, an Administrative Law Judge ("ALJ"). (R. 22). On May 22, 2008, the ALJ
issued a decision that denied Mr. Robison's claim. (R. 22-29). Mr. Robison then requested review
by the Appeals Council, which was denied on February 16, 2010. (R. 1-3). Mr. Robison sought to

appeal the decision to the federal district court under 42 U.S.C §§ 405(g) and 1383(c). On December 2, 2010 the parties consented in writing to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c)

## II.
## THE EVIDENCE

### A.
### The Vocational Evidence

Mr. Robison was born on October 7, 1955, making him 49 at the time of the alleged disability onset date. (R. 28). At the time of the hearing, he was separated from his wife and their two children, ages 14 and 16, and living with his parents. (R. 401-02, 421). He is a college graduate and has a degree in geography. (R. 402). Mr. Robison was laid off from his last position as a bus driver in July 2005 after he left one day due to headaches and depression. (R. 403-04, 406-07). Before that, he worked at Kankakee Container for twenty years, first as laborer out of college, and then as a supervisor, until his position was "discontinued". (R. 404-07). He has not worked since July 2005, aside from infrequently helping his father clean carpets. (R. 406-07).

### B.
### The Medical Evidence

The medical record indicates Mr. Robison saw Dr. Bedford in April 2003, approximately two years before his onset date. (R. 183). In that meeting, Mr. Robinson informed Dr. Bedford that he had been seeing a Dr. Reid previously, and was worried that he was taking "too much medicine." (R. 183). Dr. Bedford diagnosed him with major depression and prescribed Prozac, Effexor, Nuerontin, Risperdal, Topamax, Pamelor, Trileptal, and Klonopin. (R. 183-84). A month later, it

appeared his depression was under control, but Dr. Bedford was unsure if there were any other underlying issues other than depression and anxiety due to the extensive list of medications. (R. 182).

Mr. Robison then began seeing Dr. Win, a psychiatrist, on July 12, 2005. (R. 179-81). Dr. Win also diagnosed him with major depressive disorder, adjusted his medication and dosage, and recommended that he continue therapy. (R. 180). Later that month, Dr. Win had a follow up examination in which he opined that Mr. Robison's anxiety disorder and depressive episode were "stable." (R. 177). Another follow up examination was conducted in August 2005, in which Mr. Robison reported that he felt "better", and Dr. Win noted that his depression and anxiety were still "stable." (R. 175). In September 2005, Dr. Win noted that Mr. Robison's mood disorder was "intermittent" and adjusted his medication dosage. (R. 173). In October 2005, Dr. Win observed that Mr. Robison's mood disorder had improved and reduced his medication dosage. (R. 171). In November 2005, Mr. Robison complained that he felt "depressed" and Dr. Win assessed that the mood disorder was "intermittent". (R. 169). Mr. Robison continued to see Dr. Win every one to two months. (R. 326-42, 316-21). Although Dr. Win recommended therapy, he noted that Mr. Robison would not follow through because of financial reasons. (R. 337).

In February 2007, Dr. Win noted that Mr. Robison's mood disorder was "recurrent" and was hesitant to make many changes in his medication because he was not compliant with treatment. (R. 334). At the time, Mr. Robison had stopped taking Effexor and Seroquel, and so Dr. Win prescribed additional medications, Zyprexa and Alprazolam. (R. 335). In April 2007, Mr. Robison stated that he would reduce his checkups to every three months, because he was feeling better. (R. 330). In July 2007, Dr. Win notes that Mr. Robison's mother described him as "better overall in the last

several months." (R. 328). In October 2007, Mr. Robison's mom noted that he has "emotional sadness," and his father stated that "he just sits all day on the sofa with his head down and [complains about] his pain." (R. 326). Dr. Win saw Mr. Robison's mood disorder as "unchanged" and suggested that Mr. Robison start talk therapy, or take up a hobby to distract himself from his worries. (R. 326-27).

In July 2005, Mr. Robison started seeing James Kelly, M.D. for his headaches. (R. 386). At that time, Mr. Robison reported that he was experiencing chronic, diffuse headaches that were exacerbated by stress, anxiety, and coughing. (R. 386). Mr. Robison reported that the headaches began acutely in February 2005 without any obvious cause, but Dr. Kelly noted that Mr. Robison was a "rather poor historian." (R. 386). Although Dr. Kelly suspected the headaches were of unclear etymology, he noted that Mr. Robison had been noncompliant with medication for hypertension and wanted to rule out hypertension headaches first. (R. 387-88). Two weeks later, with his blood pressure under control, Mr. Robison reported that the headaches were persisting. (R. 384). After examination, Dr. Kelly diagnosed possible supraorbital neuralgia and administered nerve blocks. (R. 385). Shortly thereafter, during a follow-up exam Mr. Robison described very significant improvement in the intensity of his headaches along with diminished frequency. (R. 383). However, Mr. Robison's headaches returned in September 2005, and he was administered further nerve blocks. (R. 381). Dr. Kelly noted a "gradual recurrence in pain which is significantly improved for extended periods" after previous nerve blocks and so nerve blocks were administered again in early December 2005 (R. 376). After this last round of nerve blocks, Mr. Robison noted "complete relief" of his headaches on discharge. (R. 376).

In late December, Mr. Robison reported his headache was still resolved. (R. 375). However,

in late January 2006, Mr. Robison claimed his headaches had returned; more nerve blocks were given.  (R. 370).  In February 2006, Dr. Kelly again noted the return of dull, continuous headaches and prescribed a Durgasic patch.  (R. 368).  On March 3, 2006, Dr. Kelly performed more nerve blocks in response to reportedly increasingly severe headaches, as the procedure had been shown to be "quite effective" in the past of reducing Mr. Robison's pain and its intensity.  (R. 367).  Mr. Robison returned a week later, reporting only short-term relief and Dr. Kelly recommended trying a different treatment, pulsed radio frequency.  (R. 366).  In May 2006, Mr. Robison returned to Dr. Kelly and claimed his headaches had been completely resolved since he had stopped drinking diet soda.  (R. 363).

In August 2006, the headaches had returned, and Dr. Kelly recommended trying a Duragesic patch again (Mr. Robison had previously stopped that medication while attempting to get a Commercial Driver's License).  (R. 359).  The headaches did not return until March 2007, when Mr. Robison was administered more nerve blocks.  (R. 352).  In May 2007, Mr. Robison reported intermittent headaches that were not particularly problematic at the time.  (R. 350).  In August 2007, Mr. Robison again complained of recently increasing headaches, but wanted to hold off on further injections as the Fentora he was taking was helping manage the pain.  (R. 346).  However, Mr. Robison asked for a stronger dosage of Fentora, as the current one was not always effective in completely relieving the pain.  (R. 346).

Approximately one month later, on September 5, 2007, Mr. Robison again complained of headaches, which prompted Dr. Kelly to repeat the nerve blocks because "they have been quite helpful in the past."  (R. 345).  In the follow up to that injection on September 19, 2007, Mr. Robison self reported "modest improvement" and stated that the Duragesic patch had been

"significantly beneficial" in controlling the headache pain. (R. 344). Mr. Robison returned for a follow up exam in October 2007, in which he stated that the Duragesic patch helped, but started to wear off too quickly, with its effectiveness gone after two days. (R. 343). Dr. Kelly refilled the prescription so that the patches could be applied every two days, instead of the regularly prescribed three days. (R. 343).

In additions to headaches, starting back in December 2005, Mr. Robison also complained to Dr. Kelly about increasing low back pain that radiated down into the buttocks. (R. 375). Since it was unclear what precipitated the back pain, Dr. Kelly sent him for an MRI of the lumbar spine. (R. 375). In January 2006, the MRI revealed degenerative changes of the disks, most notably at L5-S1 and to a lesser degree at other levels, particularly L2-3. (R. 373). There was no definite disk herniation at any level, and the most prominent findings were the dehydration of the disk at L5-S1 with some posterior bulging and slight loss of disk height. (R. 373). Dr. Kelly assessed that Mr. Robison had degenerative disk disease with a possible component of lumbar radiculopathy and recommended proceeding with a trial of lumbar epidural steroid injections, which were administered later that month. (R. 374, 372).

In February 2006, Mr. Robison returned, stating a 50% improvement after the initial injection and Dr. Kelly administered another injection. (R. 369). During the follow-up exam, Mr. Robison reported that his low back pain was "significantly better" after the injections and later reported no low back pain in March 2006. (R. 368, 366). Nevertheless, in April 2006, Mr. Robison returned, citing the recurrence of severe low back pain and another epidural injection was given. (R. 365, 364). In May 2006, Mr. Robison reported persistent low back pain stating that activities such as prolonged standing and walking increased the pain while sitting or lying down provided

relief.  (R. 363).

Dr. Kelly recommended continuing with the epidural injections and Mr. Robison received two that month.  (R. 361-63).  In June 2006, Dr. Kelly noted Mr. Robison had "virtually no pain" since the last injection and that the residual pain experience by him was intermittent and minimal. (R. 360).  At that point, Dr. Kelly documented a complete resolution of Mr. Robison's lumbar radicular pain.  (R. 360).  In September 2006, Mr. Robison returned to Dr. Kelly, complaining of a reoccurrence of intense low back pain which radiated down towards the buttock and hip.  (R. 357). Mr. Robison reported that the pain was generally intermittent, but as related before, worsened when he sat or stood for prolonged periods.  (R. 357).  Dr. Kelly diagnosed left sacroiliac arthropathy, and recommended a left sacroiliac joint injection and an arthrogram which were both administered in December 2006.  (R. 355, 356).

In February 2007, Mr. Robison had a follow up exam in which reported severe left lower back pain that radiated all the way down into his leg following a fall down the stairs.  (R. 354).  Dr. Kelly diagnosed post trauma pain, and recommended x-rays to determine the extent of the injury. (R. 355).  The X-rays showed no acute fracture and Dr. Kelly performed more epidural injections. (R. 353).  In May 2007, Mr. Robison again complained of flare-ups in his lower back and left buttock, leading Dr. Kelly to administer more epidural injections in June and July 2007.  (R. 347-49).  After those injections, Mr. Robison reported continuing improvement.  (R. 347-48).  In October 2007, Dr. Kelly noted that Mr. Robison was experiencing pain from his degenerative disc disease and the only recommendation was to continue taking pain medication and follow up in a month.  (R. 343).

In May of 2006, Mr. Robison underwent a Psychiatric Review Technique with Patricia

Beers, Ph.D. (R. 263-76). In her medical summary, she noted that Mr. Robison had non-severe impairments and coexisting non-mental impairments that require referral to another medical specialty. (R. 263). She noted that Mr. Robison has Depressive Psychosis based on Listing 12.04 for Affective Disorders and that it is "partially controlled with medication." (R. 263, 266). In terms of functional limitations, Dr. Beers found that Mr. Robison had mild limitations in activities of daily living and in maintaining social functioning, in maintaining concentration, persistence, or pace. (R. 273). She further reported he had experienced one or two episodes of decompensation of extended duration. (R. 273).

Also in May 2006, Mr. Robison was examined by Michael Nenaber, M.D, as part if a Physical Residual Functional Capacity Assessment. (R. 277-84). Dr. Nenaber noted that Mr. Robison had the following exertional limitations: occasionally lifting and/or carrying twenty pounds; frequently lifting and/or carrying ten pounds; standing and/or walking about six hours in an eight hour work day; sitting (with normal breaks) for about six hours in a work day and no limitation on pushing and/or pulling. (R. 278). Dr. Nenaber also noted that Mr. Robison had several environmental limitations – namely that he should avoid concentrated exposure to: extreme heat or cold; wetness; humidity; noise; vibration; and fumes, odors, dusts, gases, poor ventilation, etc. (R. 281). Otherwise, Dr. Nenaber noted no postural, manipulative, visual, or communicative limitations. (R. 279-81).

In January of 2008, after the administrative hearing and at the request of the ALJ, Erwin Baukus, Ph.D. performed a Psychological Mental Status Evaluation. (R. 390-97). Mr. Robison drove himself there, but "had to" bring his mother because, as he stated, he could not go anywhere without someone. (R. 390). Mr. Robison reported to Dr. Baukus that he had the following

symptoms: pervasive loss of interest in almost all activities; sleep disturbance (fitful); tearfulness; decreased energy; feelings of guilt and worthlessness; difficulty concentrating and thinking; thoughts of suicide; generalized anxiety about inability to function independently outside of his parents' house; sour stomach; headache pain controlled with Fentanyl patch; and chronic lower back pain.  (R. 392).  Dr. Baukus noted that Mr. Robison had a labile affect, was easily moved to tears, and that his mood was very depressed.  (R. 393).  Dr. Baukus, based on his clinical examination and a review of the medical evidence, diagnosed Mr. Robison with chronic depression and agoraphobia without panic.  (R. 394).

Dr. Baukus filled out a Social Security form, noting that Mr. Robison had mild or slight limitations in: understanding, remembering and carrying out simple instructions; ability to make judgments on simple work-related decisions; carry our complex instructions; and ability to make judgments on complex work-related decisions.  (R. 395).  However, Dr. Baukus found *marked* or *serious* limitations in Mr. Robison's ability to interact appropriately with supervisors, co-workers, and the public, as well as respond to changes in a routine work setting.  (R. 396).  The Social Security form notes that "marked" means a "substantial loss to effectively function." (R. 395).  Of particular importance to Dr. Baukus in his assessment, was Mr. Robison's agoraphobia, which kept him from going anywhere by himself.  (R. 396).

In addition to medical reports there is an Adult Third Party Function Report filled out in May 2006, by Mr. Robison's mother, Betty Robison.  (R. 119-26).  In the report, his mother states, under daily activities, that Mr. Robison fed and cared for their pets without assistance, that he drove his daughters to school and to their friends' homes when needed, and that he did not experience any issues with personal care.  (R. 120).  She noted the before his disabilities, he had no difficulty

"lifting, walking long distances" and was generally happy and at ease. (R. 120). Despite his current condition, Mr. Robison's mother related that he was able to do some household chores and yard work without needing encouragement, and that he was able to drive and ride in a car, with no trouble going out by himself. (R. 121). She also noted that he has no difficulties with shopping or handling money, and that his hobbies were watching TV and movies. (R. 122). In terms of social activities, Mr. Robison infrequently spent time with others, but went to church, the grocery, and his children's events on a regular basis and did not need someone to accompany him. (R. 122-23).

Although she described him as "not social in general", she noted he had no problems getting along with family, friends, neighbors, or others. (R. 123). She further stated that he is "okay" at following written and verbal instructions, and getting along with authority figures. (R. 123). She observed that his ailments affected his ability to perform lifting, squatting, walking, bending, and kneeling, and that he "[c]an't do anything that requires endurance or a lot of strength." (R. 122-23). She noted in conclusion that Mr. Robison has had debilitating headaches that the nerve blocks no longer seemed to help, problems with depression and anxiety that medication has eased, and fatigue and weakness from a degenerative disc which gave him pain in his back and more recently, his hip and leg. (R. 125).

Two days later, Mr. Robison's mother also filed a Daily Activities Telephone Report that reiterates many of the previous described symptoms and activities described above. (R. 127). She reiterated that Mr. Robison has had trouble with depression for some time, and although he was crying less then before, he still cried occasionally. (R. 127). He last worked in 2005, and quit because his headaches were frequent and severe. (R. 127). She explained that with medication he "is more even keel" although he "still has some low days." (R. 127). She stated that he was able

to sleep at night "pretty well," that he no longer had panic attacks, and that although he seldom saw friends, he saw his daughters almost every day. (R. 127). He no longer went to church regularly, but had been attending his daughters' ball games. (R. 127). She went on to explain that he drove, was able to leave the house by himself, and helped with chores by using the vacuum and taking care of the cats, but he often he did not feel good about himself. (R. 127). Finally, she adds that his depression and medication made him feel "less than good" and that the low stamina and fatigue he experienced a majority of the time limited his ability to do many things. (R. 128).

### C.
### The Administrative Hearing Testimony

### 1.
### Mr. Robison's Testimony

Mr. Robison testified that his last job was working for Kankakee County Training Center as a bus driver, a position which he held for a couple years. (R. 403). He had headaches and depression one day he left work and never came back. (R. 404). He has not worked since then nor has he looked for work, although he infrequently helps his father with a carpet cleaning side business. (R. 406-07, 420). He testified that he has headaches daily, which were either migraines or tension headaches, and that once they started, they tended to last all day. (R. 407). Mr. Robison also testified that he was taking Duragesic patches for the headaches, which helped him without side effects. (R. 408). Previously, he had tried nerve blocks in his forehead but Mr. Robison testified that they were not effective. (R. 418). Mr. Robison testified that the patch has allowed him to take less Excedrin than he used to, which would give him ulcers. (R. 419).

Mr. Robison also testified that he is receiving treatment for depression and anxiety. (R. 408).

Mr. Robison sees Dr. Win who only managed his medication, and at the time of the hearing, was prescribing him Zoloft, Xanax, and Neurontin. (R. 408-09). He has also tried other antidepressants, including Prozac and Paxil, but he testified that they do not help. (R. 409). Mr. Robison had seen a counselor in the past, but not in over a year, was relying on his medications exclusively for relief. (R. 408-09).

Mr. Robison also testified he suffered back pain from a herniated disk that was diagnosed about ten years ago. (R. 415). He stated that the back pain had gotten so bad that he could not rake leaves and had trouble bending and then standing back up. (R. 415-16). He testified that he could stand up for long periods of time until he bends over, at which point his back would begin to hurt. (R. 418). Mr. Robison stated that when sitting, he would have infrequent pain that affected his buttocks and legs, requiring him to stand up and walk around. (R. 417). However, Mr. Robison testified that he didn't have any problems with his back when he was driving a bus and reiterated that it was his anxiety and headaches that caused him to quit his job. (R. 417). At the time of the hearing, Mr. Robison was seeing Dr. Kelly at the Pain Management Center for his back pain and was receive epidurals when the pain got "bad." (R. 416).

In terms of daily activities, Mr. Robison stated that he did not cook or do laundry, but he would vacuum, clean up cat boxes and help take care of the cats, shop for groceries, help wash dishes, gather up trash, and talk on the telephone. (R. 410). He testified that he had a valid license and had no problem driving himself around. (R. 402-03). He would not go shopping in big stores or the mall because he disliked being around large groups of people, but he was able to take care of his own personal hygiene and had no trouble keeping up with what he needed to do. (R. 410). In terms of social interaction, Mr. Robison testified that he would not visit anybody or see any visitors,

he was not involved in any social groups or clubs, he did not have any hobbies, and he would not go out to eat or see a movie. (R. 411). Mr. Robison belonged to a church, but only went a few times a year. (R. 411). In describing a typical day, Mr. Robison testified that his wake-up time to varied, but once up, he would watch some TV, and spend about an hour on the computer; he didn't do any reading or fix his own meals. (R. 412). He took occasional walks, but mostly would just lie around during the day often taking one-hour naps. (R. 413, 421). Mr. Robison testified he did not sleep through the night, tending to wake up several times throughout (R. 409).

During questioning by his attorney, Mr. Robison testified that when he wakes up, he would come downstairs and just sit and cry. (R. 413). He stated that this is a daily occurrence and that hopefully the tranquilizers then kick is so he can get dressed. (R. 414). He agreed that the morning and dusk were the worst parts of the day. (R. 414). Although he was treated for depression for approximately fifteen years, he stated that it had gotten worse after he was fired from Kankakee Container. (R. 414). After being asked about being separated from his wife, Mr. Robison testified that when the lived together, he would wake up and hide in the garage so his family would not see him cry. (R. 414). He stated that he separated from his wife to live with his parents for a while, hoping to get better. (R. 414). Mr. Robison also testified that he does see his children, although "not enough" and when he does they are rude to him. (R. 421).

## 2.
## The Medical Expert's Testimony

Dr. David Biscardi then testified as a medical expert. (R. 421-22). The ALJ asked Dr. Biscardi if there was adequate medical information in the record to render an opinion, to which Dr. Biscardi indicated there was not. (R. 421). Dr. Biscardi testified that updated treatment records and

a scaled mental status assessment were necessary. (R. 422). Dr. Biscardi noted that based solely on the records provided by Mr. Robison, which only went up to July 2006, Mr. Robison was capable of simple work activities. (R. 422). Additionally, based on the most recent, at that time, third party assessment, Dr. Biscardi believed Mr. Robison could keep pace in most areas. (R. 422). Finally, Dr. Biscardi testified that without more information, Mr. Robinson did not have a condition that met or equaled one of the listed impairments specifically Listing 12.04. (R. 422).

### 3.
### Testimony of Charles Robison, Father of Mr. Robison

Mr. Robison's father, Charles Robison, then testified on his behalf. (R. 424). He testified that about four years ago, he and his wife decided to let their son, Mr. Robison, move back in with them so they could keep an eye on his medication usage and compliance. (R. 424). Another reason they let him move back in, was that Mr. Robison would cry a lot and was deeply embarrassed crying in front of his wife and children. (R. 425). Mr. Robison's father observed that his son felt "terrible all the time", was frequently downcast and depressed, and didn't "feel like doing anything." (R. 425-26). He testified that his son used to enjoy spending time on the computer and Internet, but increasingly would just lie around, watch television, and sleep. (R. 425-26). In Mr. Robison's father opined that the reason his son was unable to hold down a job was because "he doesn't feel well enough to go to work in the first place." (R. 426). He stated that his son had headaches daily, although they were not always debilitating. (R. 427). In the past, his son has had to be taken to the emergency room for his headaches, but not since he started using the new pain patch. (R. 427). Mr. Robison's father finished his testimony saying that although his son outwardly appears as if nothing

is wrong with him Mr. Robison was not himself anymore, and as his father, he worries about him so much.  (R. 428).

## D.
## The ALJ's Decision

The ALJ found that Mr. Robison had severe impairments of chronic depression, anxiety, and degenerative disc disease of the lumbar spine.  (R. 23).  Mr. Robison did not have an impairment or combination of impairments that met or medically equaled any of the listed impairments including listings 1.04 for Disorders of the Spine, 12.04 for Affective Disorders, and 12.06 for Anxiety Disorders.  (R. 25-26).  *See* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526.  The ALJ found that medical evidence did not show that Mr. Robison's physical impairment resulted "in an inability to ambulate effectively or perform fine and gross movements effectively" and that he was capable of maintaining a "reasonable walking pace over a sufficient distance" in addition to "performing fine and gross manipulations to be able to carry out activities of daily living."  (R. 26).  The ALJ acknowledged that Mr. Robison had undergone mental health treatment but determined that his depression and anxiety caused no more than a mild limitation in performing activities of daily living and maintaining social functioning.  (R. 26). The ALJ further noted that Mr. Robison was able to perform daily tasks such as maintaining personal hygiene, handling appointments, and keeping his home clean. (R. 26).  The ALJ found limited problems with social functioning pointing to evidence from the record that Mr. Robison attended church regularly, visited his daughters and exhibited appropriate social functioning during his evaluation.  (R. 26).  The ALJ did take into consideration Mr. Robison claims that he was easily distractible and consequently found moderate limitations in

his concentration, persistence, or pace. (R. 26). Finally, the ALJ noted that there was no evidence of any episodes of decompensation of extended duration. (R. 26).

The ALJ also found that Mr. Robison retained the functional capacity to perform medium, unskilled work. (R. 26). The ALJ stated that although Mr. Robison's "medically determinable impairments could reasonably be expected to produce [his] alleged symptoms", his statements regarding the "intensity, persistence and limiting effects" of those symptoms were "not credible to the extent they are inconsistent with the residual functional capacity." (R. 27). In support of this finding, the discussed the daily activities of Mr. Robison, noting the post-hearing psychological examination found relatively normal activities of daily living and social functioning - which was confirmed by the function report filed by Mr. Robison's mother. (R. 27). Next, the ALJ continued to look at Mr. Robison's mother's statements, concluding that although her relationship with the claimant was close, her statements did not describe functional limitations that would preclude Mr. Robison form performing all work. In particular, the ALJ contrasted Mr. Robison's mother's claim that the nerve blocks were not working for her son, with Dr. Kelly's report that Mr. Robison "was responding favorably to medication." (R. 27). The ALJ explained that:

> The medical records show that the pain from his back and neuralgia are appropriately treated with medication, including injections and oral medication. The claimant also has responded appropriately to treatment of his depression and anxiety with prescription medication. While he may have some fatigue as a side effect of medications, there is no evidence that he would be completely unable to do work involving simple tasks (i.e., unskilled work) as long as he continues to comply with treatment.

(R. 27).

The ALJ concluded that Mr. Robison was unable to perform his past relevant work, as a bus driver, supervisor, or laborer. Specifically, the ALJ found the jobs of bus driver and supervisor

exceeded Mr. Robison's residual functional capacity ("RFC") due to their requirements for "interaction with the public, co-workers or supervisors." (R. 27). Similarly, the ALJ found the job of laborer exceeded Mr. Robison's RFC for "medium exertional duty work." (R. 27). However, despite these findings, the ALJ applying grid rule 203.22 found that Mr. Robison could perform jobs that exist in significant numbers in the national economy. (R. 27-28).

## III.
## DISCUSSION

### A.
### The Standard of Review

We review the ALJ's decision directly, but we play an "extremely limited" role. *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009); *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008). "We do not actually review whether [the claimant] is disabled, but whether the Secretary's finding of not disabled is supported by substantial evidence." *Lee v. Sullivan*, 988 F.2d 789, 792 (7th Cir. 1993). If it is, the court must affirm the decision. 42 U.S.C. § 405(g). Substantial evidence is " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010). The court may not reweigh evidence or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Simila*, 573 F.3d at 513-14; *Binion v. Chater*, 108 F.3d 833, 841 (7th Cir. 2007). While the standard

of review is deferential, the court cannot "rubber stamp" the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).

Although the ALJ need not address every piece of evidence, the ALJ cannot limit his or her decision to only that evidence that supports his or her ultimate conclusion. *Herron v. Shalala*, 19 F.3d. 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of the findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Jelinek v. Astrue,* 662 F.3d 805, 812 (7th Cir.2011); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). It is a "lax" standard. *Berger*, 516 F.3d at 545. The ALJ does not need to address every piece of evidence, but he cannot subjectively limit his discussion of the evidence to only that which supports his conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). It is enough if the ALJ "minimally articulate[s] his or her justification for rejecting or accepting specific evidence of a disability." *Berger*, 516 F.3d at 545; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

## B.
## The Five-Step Sequential Analysis

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1.  is the plaintiff currently unemployed;

2.  does the plaintiff have a severe impairment;

3.  does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4.  is the plaintiff unable to perform his past relevant work; and

5.  is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. § 404.1520; *Simila*, 573 F.3d at 512-13; *Briscoe*, 425 F.3d at 351-52.  An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. § 416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan*, 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.  20 C.F.R. §  404.1520; *Stein*, 892 F.2d at 44.  The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352.

## C.
### Analysis

### 1.
### Mr. Robison's Objections

Mr. Robison raises several criticisms of the ALJ's decision.  First, Mr. Robison contends that his case should be reversed and remanded to the Commissioner for an award of benefits because the requested Psychiatric Consultative Examination, which the ALJ himself requested, proves that he is disabled, and that the ALJ merely glossed over Dr. Baukus' report and offered no rational for rejecting it's conclusions – the effect of which was to impermissibly substitute his own lay opinion for that of a CE.

Mr. Robison also contends that the ALJ failed to make a proper credibility determination under SSR-96-7p. He argues that the ALJ simply stated in a conclusory fashion that Mr. Robison's statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible and that the ALJ impermissibly summarized evidence without any meaningful explanation of why Mr. Robison was not credible.

Finally, Mr. Robison contends that the ALJ's RFC Assessment is insufficient as a matter of law and requires remand. He argues that the ALJ had no medical basis for the RFC determination and instead relied on his own lay opinion. Specifically, Mr. Robison argues that the ALJ failed to properly explain how he reached the RFC determination and completely failed to address his headaches and their possible effect on his RFC. Similarly, Mr. Robison also argues that the ALJ ignored his own findings that Mr. Robison had moderate limitations in concentration, persistence or pace an then ignoring in his analysis determining that Mr. Robison would be able to perform unskilled work.

### a.
### Reversal for Award of Benefits

Mr. Robison argues the ALJ's decision must be reversed and remanded to the Commissioner for an award of benefits because the Psychiatric Consultative Examination ("PCE") (R. 390), ordered by the ALJ, demonstrates that he is disabled and that the ALJ provided no analysis or gave reasons why that opinion was rejected. (*Memorandum in Support of Plaintiff's Motion*, at 5-6). Mr. Robison argues the PCE, which he believes is consistent with other medical evidence in the record, is sufficient to establish that he is disabled for purposes of DIB. (*Memorandum in Support of Plaintiff's Motion*, at 3-4). This argument is not persuasive.

A reversal to award benefits is proper only "if all factual issues have been resolved and the resulting record supports only one conclusion – that the applicant qualifies for disability benefits." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 356 (7th Cir. 2005). Because the determination of disability is a finding of fact best left to the Commissioner, the record must be unambiguously clear that the claimant is disabled, *Campbell v. Shalala*, 988 F.2d 741, 744 (7th Cir. 1993). Here however, the record does not "yield but one supportable conclusion." *Id.*

It is true that in the PCE Dr. Baukus raises serious questions about Mr. Robison's ability to work. *See supra,* at 8-9. Dr. Baukus found that Mr. Robison had marked limitations in the ability to interact appropriately with the public, supervisors, and coworkers, in addition to limitations in the ability to respond appropriately to usual work situations and changes in a routine setting. (R. 396). If this exam were uncontested by the other evidence in the record, a reversal with an award of benefits might be appropriate. However, despite Mr. Robison's assertions, that is not the case. There are several unresolved factual disputes, including contradictory medical reports and testimony. For instance, Mr. Robison testified that he has no restrictions on his driving ability, which his mother corroborated in her Third Party Function Report, stating that he often drives his daughters to school or friends' houses as needed. (R. 402-03, 120). This is inconsistent with Dr. Baukus' observations that Mr. Robison is unable to go anywhere by himself due to his agoraphobia, which was a crucial factor in Dr. Baukus' conclusion. (R. 396). In addition, the Commissioner correctly notes that Dr. Win's medical records reflect that Mr. Robison's depression was relatively stable and improving. Dr. Win's final report recommended that Mr. Robison pick up a hobby or "get out and do something for others" to help alleviate his worries. (R. 326-27). It is not clear what

effect this should be given. Is it an implied assertion that Mr. Robison was really okay and should get on with the business of living? One cannot tell. It is a rejection of what Mr. Robison would testify to where he claimed that no medication has helped and that his depression and anxiety are the main impediments to employment. (R. 409, 413). While Mr. Robison's case should be remanded as discussed *infra*, these factual and medical inconsistencies must be resolved by the Agency, thereby requiring a remand. An awarding of disability benefits at this time would not be proper.

### b.
### Credibility Determination

An ALJ's credibility assessment and ultimate determination may not be perfect or ideal, but they need not be. *Outlaw v. Astrue*, 412 Fed. Appx. 894, 899, 2011 WL 891803, at *5 (7th Cir. 2011); *Simila*, 573 F.3d. at 517; *Berger*, 516 F.3d at 546. So long as the former is not "patently wrong," *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010), and the latter finds "some support" in the record, *Berger*, 516 F.3d at 546, an ALJ's credibility and eligibility determinations will not be disturbed, regardless of how a reviewing court might have viewed the matter were it *res integra*. Failure to adhere to this fundamental principle of judicial review would effectively shift the center of authority from the ALJ to the courts and impermissibly realign the different roles and responsibilities that Congress has allocated to the Social Security Administration and the judiciary.

Thus, when determining the sufficiency of the ALJ's credibility determination, a reviewing court must give that determination "special deference." *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010). This is because the ALJ, and not the reviewing court, is in the best position to determine witness credibility. *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008); *Eichstadt v. Astrue*, 534 F.3d.

663, 667-68 (7th Cir. 2008). For a credibility determination to be "patently wrong" so that it must be overturned, it must be "lack[ing] any explanation or support." *Elder*, 529 F.3d. at 413-14; *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006); *Berger*, 516 F.3d at 546.

Mr. Robison takes issue with the ALJ for stating "in a conclusory fashion" that Mr. Robison's statements concerning the intensity, persistence and limiting effects of his symptoms were not credible to the extent they were inconsistent with the residual functional capacity assessment. An ALJ must support his credibility finding with articulate reasoning based on evidence in the record. *See Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003). In examining the credibility of the claimant, the ALJ must take a number of factors into account, including the objective medical evidence, descriptions of the symptoms, treatments used to assuage those symptoms, and the daily activities of the claimant. *Id.*; *Simila*, 573 F.3d at 517; 20 C.F.R. § 404.1529(c)(2)-(4).

Here, the ALJ properly determined that Mr. Robison's claimed degree of limitation was not credible. (R. 27). In his decision the ALJ does invoke the unilluminating phrase that was found to be conclusory and consequently insufficient in *Brindisi* ("claimant's symptoms are not credible to the extent they are inconsistent with the … residual functional capacity assessment). However, unlike *Brindisi*, that is not the sole extent of the ALJ's credibility analysis. Rather, he explains, with references to the record, how he arrived at his determination. (R. 27). The ALJ looked at Mr. Robisons's self-claimed limitations and found them inconsistent with the medical evidence, the opinions of his treating physicians, his daily activities, and his mother's statements. For example, the ALJ pointed to the "relatively normal activities of daily living and social functioning" found in the third party function report filed by Mr. Robison's mother and the post-hearing PCE. (R. 27).

23

Furthermore ALJ explained that the medical records show Mr. Robison had "responded favorably to treatment" and that his back pain and neuralgia "are appropriately treated with medication, including injections and oral medication." (R. 27). The ALJ could have been more thorough in his discussion of Mr. Robison's credibility. However, "[n]o principle of administrative law or common sense requires [a reviewing court] to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Fisher v. Brown*, 869 F.2d 1055, 1057 (7th Cir. 1989). Here the ALJ's credibility determination does not lack "any explanation or support", nor is it "patently wrong", and consequently cannot be disturbed. *Elder*, 529 F.3d. at 413-14.

### c.
### Sufficiency of RFC Determination

Mr. Robison also contends that the ALJ's Residual Functional Capacity Assessment ("RFC") is insufficient as a matter of law and requires remand. (*Memorandum in Support of Plaintiff's Motion*, at 9-15). First, Mr. Robison argues that the ALJ had no medical basis for the RFC determination and instead improperly used his own independent medical determination. (*Memorandum in Support of Plaintiff's Motion*, at 9-10). In part, this is based on the contention that the ALJ did not properly analyze Dr. Baukus' opinion or explain why it was not adopted. (*Memorandum in Support of Plaintiff's Motion*, at 5). Additionally, Mr. Robison asserts that the ALJ failed to properly explain how the RFC was determined and failed to include Mr. Robison's headaches in the RFC assessment. (*Memorandum in Support of Plaintiff's Motion*, at 10-13). Similarly, the ALJ failed to account for limitations in concentration, persistence or pace in the RFC

assessment. (*Memorandum in Support of Plaintiff's Motion*, at 13-15). Mr. Robison's objections are valid and are sufficient to necessitate remand.

The ALJ determined that Mr. Robison had the residual functional capacity to perform medium work and limited to unskilled work. (R. 26). The RFC discussion is brief. In his analysis, the ALJ first rejects the report by Mr. Robison's mother, as he could, correctly noting its inconsistencies with medical records from treating physicians indicating that the pain from Mr. Robison's back and neuralgia were appropriately treated with medication, and that he was responding favorably to treatment of his depression and anxiety with prescriptions. (R. 27). The ALJ then ends his RFC determination with the conclusion that while Mr. Robison may suffer some fatigue as a side effect of the various medications he was taking, "there is no evidence that he would be completely unable to do work involving simple tasks (i.e., unskilled work) as long as he continues to comply with treatment." (R. 27). The problem is that Dr. Baukus' PCE is completely ignored in the RFC determination. In fact, the PCE is mentioned only in the findings of fact where, the ALJ remarks that that the evaluation did not show any "significant difficulties indicative of marked limitations in concentration, persistence or pace" but that Dr. Baukus believed "agoraphobia caused marked limitations in dealing with others or [the] ability to respond to normal work changes." (R. 24). This concludes the ALJ's "analysis" of Dr. Baukus' opinion and there is only one further reference in the entire decision, presumably when the ALJ determined that Mr. Robison was unable to perform past work as a bus driver or supervisor because those jobs "exceed the claimant's residual functional capacity due to requirements for interaction with the public, co-workers, or supervisors." (R. 27). It is puzzling that the ALJ would consider those limitations as relevant to Mr. Robison's ability to perform past work, and fail to address the them in his RFC determination.

Mr. Robison's argument that Dr. Baukus' opinion was improperly ignored by the ALJ is compelling. An ALJ simply cannot ignore or reject medical evidence that weighs against the RFC determination without sufficient analysis. *See SSR 96-8p* ("If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."); *see also Zurawski v. Halter*, 245 F.3d 881, 889-90 (7th Cir. 2001) (reversing where an ALJ "made no attempt to explain" why medical evidence in the record that was contrary to the RFC determination was less persuasive than the evidence that was cited). What is even more perplexing is the fact that this PCE was made, presumably, at the request of the ALJ following his examination of the medical expert at the administrative hearing who testified that there was insufficient evidence to make a determination. (R. 422-423).

"'While an administrative law judge is not required or indeed permitted to accept medical evidence if it is refuted by other evidence,'" an ALJ must determine the weight a nontreating source's (e.g., physician, psychologist) opinion deserves. *Simila*, F.3d at 515 (7th Cir. 2009) (quoting *Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir.1995). And, he must explain the reasons for that finding. *Craft*, 539 F.3d at 676 (7th Cir. 2008)(citing 20 C.F.R. § 404.1527(d), (f)). In making that determination, the ALJ should examine how well a treating source supported and explained his opinion, whether his opinion is consistent with the record, whether the source is a specialist in a given field, and any other factor of which the ALJ is aware. *Simila*, F.3d at 515 (7th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(3)-(6)).

Dr. Baukus' opinion, if accurate, raises serious concerns about Mr. Robison's ability to perform work, and the ALJ merely summarized his findings. It seems likely that someone who is markedly limited in dealing with the general public, co-workers, and supervisors and is similarly

limited in his ability to respond to normal work changes would have some corresponding difficulty working. This concern is reflected in SSR 85-15, which states that a substantial loss of the ability to respond appropriately to supervision, coworkers, and usual work situations would "severely limit the potential occupational base" and could justify by itself a finding of disability. *SSR 85-15*. By no means was the ALJ required to adopt Dr. Baukus' report as the decision on weighing evidence to determine disability is reserved to the ALJ. 20 C.F.R. §§ 404.1527(b), (e). But, "it is the ALJ's responsibility to resolve conflicting medical evidence" and the "method of doing so must be reasonable and adequately explained." *Bailey v. Barnhart*, 473 F. Supp. 2d. 822, 849 (N.D. Ill. Apr. 2, 2006). The ALJ here made no effort to address Dr. Baukus' report.

Additionally, the ALJ failed to consider a Physical Residual Capacity Assessment performed by Dr. Nenaber in May 2006, which determined that Mr. Robison had both exertional and environmental limitations. (R. 277-84). Dr. Nenaber observed that Mr. Robision had the following limitations: could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for about six hours in an eight hour workday, and sit about six hours in an eight hour work day. (R. 278). Arguably, this evaluation could establish a limitation to "light work" under the Social Security Regulations. *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995); *SSR 83-10*. Furthermore, Dr. Nenaber found that Mr. Robison should avoid concentrated exposure to extreme cold or heat, wetness, humidity, noise, vibration, and poorly ventilated areas or fumes. (R. 281). These limitations noted by Dr. Nenaber in a CE, are not mentioned once in the ALJ's determination that Mr. Robison could perform "medium work". (R. 26). Failure to analyze this report, especially if its opinions cut against an RFC determination for "medium work", is another reason to remand.

There are other concerns, which should be addressed on reconsideration. For instance, Mr. Robison takes issue with ALJ's apparent failure to explain how he arrived at an RFC of "medium work", especially in light of Mr. Robison's degenerative disc disease. (*Memorandum in Support of Plaintiff's Motion*, at 10-13). An ALJ's failure to explain how he arrived at his RFC findings is sufficient by itself to warrant a reversal. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 445, 352 (7th Cir. 2005) (citing *SSR 96-8p*).

Similarly, the ALJ never discussed Mr. Robison's headaches with respect to his RFC. In order to fully comply with SSR 96-8p, which requires the ALJ to consider all of the claimant's impairments in assessing the RFC, the ALJ is encouraged to explore in greater detail whether his headaches effect the RFC determination. *SSR 96-8p*; 20 C.F.R. § 404.1545(e).

Finally, Mr. Robison asserts that his moderate limitations in concentration, persistence or pace are not properly accounted for by a limitation to "unskilled work." (*Memorandum in Support of Plaintiff's Motion*, at 13-15). Although the ALJ assessed "moderate" limitations in concentration, persistence or pace due to Mr. Robison's claims of distractibility, there is no meaningful analysis or explanation how this effects the RFC determination (R. 26). Instead, the ALJ simply limits Mr. Robison to "unskilled work." (R. 27). As discussed in *Craft v. Astrue*, an RFC for "unskilled work" is suitable when "the claimant has the ability to understand, carry out, and remember simple instructions; *respond appropriately to supervision, coworkers, and usual work settings; and deal with changes in a routine work setting*." 539 F.3d at 677 (citing 20 C.F.R. § 404.1545(c) and *SSR 85-15*) (emphasis added). As discussed previously, Dr. Baukus' PCE stated that Mr. Robison was "markedly" limited in his abilities to interact appropriately with supervisors, coworkers, and the public as well as respond appropriately to usual work situations and changes. (R. 396). Because

the report was not analyzed, on cannot be assured that Mr. Robison's moderate limitations in concentration, persistence or pace were properly addressed.

## CONCLUSION

The Commissioner's Motion for affirmance is DENIED and the plaintiff's Motion to remand is GRANTED.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

DATE: April 5, 2012